IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 12-0057-WS-C |
| | ) |
| VITO LA FORGIA, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

This matter comes before the Court on defendant's Motion to Dismiss, or in the Alternative to Suppress Statements (doc. 83). The Motion has been briefed and is taken under submission without a hearing.[1]

**I.     Background.**

Defendant Vito La Forgia has been indicted in this District Court on charges of conspiring to falsify the Oil Record Book for the M/V BOTTIGLIERI CHALLENGER (the "Vessel"), in violation of 18 U.S.C. § 371; obstructing justice through the concealment and

---

[1] La Forgia has requested an evidentiary hearing to explore "[t]he full extent of the misrepresentations made by the Coast Guard about the nature of its investigation." (Doc. 83, at 2.) However, no hearing is necessary, given the absence of any material disputed facts requiring credibility determinations. *See United States v. Raddatz*, 447 U.S. 667, 693, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (Stewart, J., dissenting) ("[D]istrict judges need not always hold evidentiary hearings in order properly to dispose of suppression motions. Although many motions to suppress turn on issues of credibility, many do not."); *United States v. Horne*, 2006 WL 2668919, *5 (11th Cir. Sept. 18, 2006) (no evidentiary hearing necessary on motion to suppress that presented questions of law as to existence of probable cause for search warrant); *United States v. Azzam*, 2012 WL 177534, *1 n.1 (S.D. Ala. Jan. 23, 2012) (deeming evidentiary hearing inappropriate where motion to suppress turned on questions of law). More specifically, the parties' written submissions reflect that the facts underlying La Forgia's Motion are largely uncontroverted and that the parties' dispute is with the legal implications of those facts. Also, for the reasons set forth below, the facts offered by La Forgia in support of his Motion, even if proved, would not establish a right to relief; therefore, no hearing is needed. *See United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) ("Where a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion.").

falsification of entries in said Oil Record Book, in violation of 18 U.S.C. § 1519; obstructing justice by ordering a crew member to remove a flange with a connected valve that had been used as part of a bypass system to discharge bilge waste overboard, also in violation of § 1519; and knowingly failing to maintain an accurate Oil Record Book, in violation of 33 U.S.C. § 1908(a). These charges arise from La Forgia's service as Chief Engineer aboard the Vessel at the time of its port call in Mobile, Alabama beginning on or about January 24, 2012. La Forgia now seeks to suppress certain unidentified statements he made to Coast Guard agents during their initial inspection of the Vessel.[2]

The relevant facts undergirding the Motion to Suppress do not appear to be in dispute. On January 25, 2012, the U.S. Coast Guard received an unsolicited written report signed by four Vessel crew members "stating that the Chief Engineering was pumping out oil from the bilge water tank overboard through the bilge and general service pump with dates of the incidents and how much that was pumped out." (Doc. 112, Exh. A, at 1.) Coast Guard agents discussed "how the expanded Marpol exam would take place" and designated LTJG Mike Clausen as "the team lead for this expanded Marpol exam." (*Id.* at 2.) At approximately 5:00 p.m. that day, the Coast Guard team boarded the Vessel and commenced the inspection. Early on, LTJG Clausen and LT Tonya Lim met with La Forgia, going with him to "his office/cabin and start[ing] to go over diagrams and other documents that would be useful to assist in the engine room." (*Id.*)[3] Afterwards, LTJG Clausen and LT Lim "went with the Chief Engineer [La Forgia] down into the Engine Control Room and kept him occupied going over documents, alarm records and other diagrams, sounding tables etc." (*Id.*) The record does not show how long this process lasted. In the ensuing hours, however, Coast Guard agents did the following: (i) discovered the "magic

---

[2] La Forgia has framed his motion as a "Motion to Dismiss, or in the Alternative to Suppress Statements." As such, both the dismissal and suppression remedies will be examined.

[3] LTJG Clausen explains that, at this time, he and LT Lim reviewed La Forgia's records and vessel diagrams, made copies of piping diagrams and manual inserts, and downloaded various diagrams and manuals from La Forgia's office computer. (Doc. 112, Exh. C, at 2.) In the Government's view, this occasion marked the one time that La Forgia answered Coast Guard questions and gave any kind of statement to them. *See* doc. 105, at 9 ("At the time of the statements the defendant was in his own stateroom onboard the vessel, where he reviewed documents and records with the Coast Guard."). Defendant has not identified what (if any) potentially incriminating statements he made at that time.

pipe" allegedly used to bypass the Vessel's pollution prevention equipment and discharge machinery space waste directly overboard; (ii) notified La Forgia and the Vessel's captain of that finding; (iii) instructed La Forgia to run the incinerator and observed the operation of same; (iv) assembled and photographed the bypass arrangement; and (v) interviewed witnesses, collecting testimony that La Forgia would order engineering crew members to connect the bypass at sea. (*Id.* at 3-4.)

Interestingly, the Coast Guard's records reflect that no formal statement was obtained from La Forgia during the January 25 vessel inspection. Some time after midnight, LTJG Clausen led La Forgia and the second engineer "to the galley area and told them the investigation team would want their statement." (Doc. 112, Exh. C., at 3.) La Forgia protested that he had been awake since 6:00 a.m., more than 18 hours earlier. (*Id.*) The second engineer's interview was quite lengthy because "he had a lot to say regarding the bypass piping found in the engine room." (*Id.* at 4.) When the second engineer's interview finally concluded, La Forgia "was the last to be interviewed," but he "declined to make a statement" when the Coast Guard investigator and Coast Guard Investigative Service attempted to interview him. (*Id.* at 4.)[4] That appears to have been that.

For his part, La Forgia avers that the Coast Guard agents repeatedly told him during the inspection that "it was conducting a Port State Control examination and an expanded MARPOL

---

[4] Defendant's briefs gloss over this significant detail. La Forgia's Declaration does not dispute the Coast Guard's position that he never submitted to a formal interview during the late night hours of January 25 or the early morning hours of January 26. (The unvarnished statement by La Forgia's lawyer in a brief that La Forgia was interviewed "at length … during the late evening hours" (doc. 83, at 3 & 9) is not supported by any record evidence, is contradicted by LTJG Clausen's statement, and will not be credited.) Because La Forgia declined to give a statement that night, it is unclear exactly what he seeks to suppress. Presumably, he is attempting to cast a broad net to suppress any comment or remark he may have made to the Coast Guard at any time during the approximately nine hours that the agents were onboard the Vessel on January 25 and 26, including when agents asked him to produce diagrams and manuals, directed him to operate the incinerator, and so on. La Forgia's Declaration's lone insight on this point is the vague remark that he "was repeatedly questioned by the Coast Guard and ordered to different locations on the vessel, including the vessel's engine room." (Doc. 83-1, at ¶ 10.) This lack of specificity works against defendant in his blanket argument that the totality of circumstances demonstrates that his informal statements to the Coast Guard were not made voluntarily because it omits any showing of what the circumstances were at the moment of any particular statement to which he now objects.

examination." (La Forgia Decl. (doc. 83-1), ¶ 7.) La Forgia further states that the Coast Guard never informed him that it was conducting a criminal investigation, and never read him his *Miranda* rights that day. (*Id.*, ¶ 8.)[5] The only other material details set forth in La Forgia's Declaration are that he "believed [he] was not free to leave the vessel" while the Coast Guard investigation was underway, that he was questioned in English without the aid of an Italian interpreter, and that Coast Guard officials never told him that he had the right to contact the Italian consulate. (*Id.*, ¶¶ 6, 12-13.)[6] None of these statements are controverted by the Government; therefore, all will be accepted as true for purposes of the Motion to Suppress.

## II.     Analysis.

A fair reading of the Motion is that it centers on La Forgia's contention that the Coast Guard intentionally misrepresented the purpose of the investigation as being administrative, rather than criminal. The narrow legal question presented is whether the Coast Guard's lack of candor to La Forgia during the inspection of the Vessel (*i.e.*, their failure to be forthright and notify him from the outset that he was the target of a criminal investigation) requires suppression of any statements he might have made to Coast Guard agents that day.[7]

---

[5]     It is unknown, of course, whether Coast Guard agents would have Mirandized this defendant had he in fact expressed willingness to give a statement when they attempted to interview him late that night.

[6]     La Forgia's present statement that "[i]t was my belief that I was not permitted to refuse to answer the Coast Guard's questions" (doc. 83-1, ¶ 11) is undermined by uncontroverted evidence that he declined to give a statement when the Coast Guard attempted to interview him in the late evening hours of January 25, 2012. But this discrepancy does not materially affect the analysis, so the Court need not make a finding as to La Forgia's subjective beliefs.

[7]     As noted, La Forgia frames his desired remedy for this purported deception as dismissal of the Indictment, with suppression of the evidence being sought only in the alternative. The request for dismissal appears with no citations of authority or legal argument, but is instead confined to the threadbare allegation that "the proper remedy for this violation of Mr. La Forgia's due process rights is dismissal of the indictment." (Doc. 83, at 11.) The Court is aware of no authority favoring or mandating dismissal of an indictment, rather than suppression of the statements at issue, when law enforcement agents obtain a statement through unconstitutional means. Certainly, the judicially created exclusionary rule that has been in place for nearly a century is contrary to La Forgia's demand for dismissal. *See generally Davis v. United States*, --- U.S. ----, 131 S.Ct. 2419, 2426, 180 L.Ed.2d 285 (2011) (explaining that the Fourth Amendment "says nothing about suppressing evidence," and that the exclusionary rule "is a prudential doctrine … created by this Court to compel respect for the constitutional guaranty"). (Continued)

### A. Failure to Announce Criminal Nature of Investigation Does Not Require Suppression of La Forgia's Statements.

It is a bedrock legal principle that "a confession, in order to be admissible, must be free and voluntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (citation omitted). That does not imply, however, that the use of deception by law enforcement to extract a statement from a suspect necessarily renders that statement involuntary and inadmissible. In fact, the Eleventh Circuit has flatly rejected a *per se* rule that all statements obtained through deception must be suppressed. *See United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010) ("Our circuit law rejects a *per se* rule that statements obtained by police deception must be suppressed."); *Lall*, 607 F.3d at 1285 (deceptions that involve misrepresentations of fact "are not enough to render a suspect's ensuing confession involuntary") (citations omitted).

There being no absolute prohibition on police deception in obtaining statements, it becomes important to examine context. Here, the context was that the Coast Guard inspected the Vessel, pursuant to its broad statutory and regulatory authority to conduct administrative investigations (such as Port State Control inspections and MARPOL examinations) and criminal investigations. *See, e.g.,* 14 U.S.C. § 89(a) ("The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests … for the prevention, detection, and suppression of violations of the laws of the United States."); 33 C.F.R. § 151.23 (stating that Coast Guard may inspect ships at any United States port or terminal for compliance with MARPOL 73/78, and particularly whether a ship has discharged oil or oily mixtures anywhere in violation of MARPOL 73/78, including inspection of Oil Record Book, oil content meter continuous records, and general examination of the ship).[8] There is nothing inherently

---

And *Miranda* also undermines La Forgia's plea for dismissal. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("Our holding … is this: the prosecution may not use statements … stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."). These cases are illustrative of a fundamental, black-letter point, to-wit: The remedy for a statement obtained involuntarily from a defendant is suppression, not dismissal. La Forgia's undeveloped, unsupported assertion that dismissal of the indictment is appropriate under these circumstances is unavailing.

[8] Contrary to La Forgia's theory, there is no clear line of demarcation separating the Coast Guard's "administrative inspection" function from its "criminal investigation" function. (Continued)

problematic about such dual investigations, or even dual prosecutions.  *See, e.g., F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 592 (5th Cir. 2008) ("The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled to vindicate the different interests promoted by different regulatory provisions even though it attempts to vindicate several interests simultaneously in different forums.") (citation omitted).

The Motion to Suppress hinges on the notion that the Coast Guard was obligated to inform La Forgia that it was conducting a criminal investigation as to which he was a target, so that he could consider that information in evaluating whether or not to speak with the agents. This is not a correct statement of law.  "Other circuits have agreed that Fourth Amendment and possible due process limitations may be implicated in a dual investigation. … Almost every other circuit has denied suppression, ***even when government agents did not disclose the possibility or existence of a criminal investigation***, so long as they made no affirmative misrepresentations." *United States v. Stringer*, 535 F.3d 929, 940 (9th Cir. 2008) (emphasis added and citations omitted).  Indeed, a recurring theme in the case law is that the touchstone of the suppression inquiry in the deception context is whether law enforcements made an affirmative misrepresentation.  *See, e.g., United States v. Wuagneux*, 683 F.2d 1343, 1347 (11th Cir. 1982) (explaining that a consent search is unreasonable if "consent was induced by the deceit, trickery or misrepresentation" of the Government, but that defendant "must show affirmative acts by the agent that materially misrepresent the nature of the inquiry, and the showing must be by clear and convincing evidence") (citations omitted).[9]  Statements are suppressed for reasons of deceit

---

By defendant's admission, a Port State Control inspection contemplates that the Coast Guard will verify "compliance with U.S. and International laws and regulations."  (Doc. 83, at 1 n.2.)  And an expanded MARPOL examination, by La Forgia's reckoning, involves tasks such as "examin[ation of] the vessel pollution control equipment (*i.e.*, the oily water separator, oil content meter, and incinerator)" (*id.* at 2 n.3), which the Coast Guard unquestionably did in this case.  So this is not a case where the Coast Guard was wearing its "criminal investigation" hat exclusively, but is rather a case where the Coast Guard was performing a dual function of the expanded MARPOL examination coupled with investigation of particular allegations of criminal wrongdoing by La Forgia.

[9]     *See also Agee v. White*, 809 F.2d 1487, 1494-95 (11th Cir. 1987) ("we reject appellant's contention that the police were obligated expressly to inform him prior to the … interrogation session that the police then suspected him of participating in the crime.  *Miranda* does not require that the police constantly supply detainees with all information that might be (Continued)

or trickery only in the presence of an affirmative misrepresentation, such as an outright and material lie.

The facts in this case exhibit silence, not affirmative misrepresentations. The Coast Guard officials boarding the Vessel said that they were conducting a Port State Control inspection and an expanded MARPOL examination. Those statements were not false. On the contrary, the record shows that the Coast Guard agents performed the very inspections and examinations that those kinds of administrative inquiries encompass.[10] There is no allegation that Coast Guard agents reassured La Forgia that no criminal investigation was being performed, that he was not a target, or that he would not be criminally prosecuted. La Forgia does not maintain that he asked any questions calculated to discern whether the investigation was criminal, much less that the Coast Guard answered such questions in a manner that led him to believe it was not.[11]

---

relevant in deciding whether to waive their constitutional rights. … [W]here, as here, the police did not take affirmative steps to mislead a detainee as to the possible consequences of making a confession, *Miranda* does not require that a confession be excluded as involuntary solely because of the detainee's subjective misunderstandings of those consequences."); *Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) ("the law permits the police to pressure and cajole, conceal material facts, and actively mislead, … [but] it draws the line at outright fraud," such that a defendant's consent is involuntary where "procured by an outright and material lie").

[10] To confirm this point, one need only compare the Coast Guard agents' statements about what they actually did on the Vessel to La Forgia's characterization of what a Port State Control inspection and an expanded MARPOL examination are. (*Compare* doc. 83, at 1-2 & n.2 & 3 *with* doc. 112, at Exhs. A & C.) As the Government correctly observes, "The actions of Coast Guard personnel in boarding and inspecting the Bottiglieri Challenger in Mobile were entirely consistent with a routine Port State Control document and safety exam and MARPOL." (Doc. 105, at 8.) Thus, the Coast Guard's representations about the type of inspections being performed were true as far as they went. They simply did not disclose the additional criminal component.

[11] This critical fact distinguishes this case from the *Tweel* and *Schroder* cases on which defendant relies. In *United States v. Schroder*, 2006 WL 3717896 (S.D. Ala. July 6, 2006), the "defendant's attorney specifically asked whether this was a criminal investigation," and the Coast Guard agent responded by stating falsely that it was not. *Id.* at *3. In *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977), the defendant's accountant asked the IRS agent whether a "special agent" was involved in the investigation. The IRS agent "obviously knew the accountant inquired whether a special agent was involved to determine whether he was conducting a criminal audit," yet he answered negatively even though this was indeed a criminal (Continued)

Mere silence by law enforcement agents as to the criminal aspect of their investigation has been routinely held not to constitute the sort of affirmative misrepresentation that might give rise to a viable motion to suppress. *See, e.g., United States v. Prudden*, 424 F.2d 1021, 1033 (5th Cir. 1970) (holding that "the mere failure of a revenue agent … to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit and trickery"); *United States v. Mitchell*, 966 F.2d 92, 100 (2nd Cir. 1992) (defendants' statements to EPA were not involuntary even though agents failed fully to explain purpose of interviews, where agents emphasized their advisory role concerning water quality testing rather than criminal nature of investigation, but defendants never made specific inquiry about nature of investigation and agents made no affirmative misrepresentations); *United States v. Erekson*, 70 F.3d 1153, 1158 (10th Cir. 1995) (for defendant's statements to be involuntary because of agents' deceit, "[s]imple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead") (quoting *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983)).[12]  Simply put, there is no evidence of the kinds of affirmative misrepresentations that might render La Forgia's statements involuntary and require their suppression.

---

audit. *Id.* at 299.  Thus, in *Tweel* and *Schroder*, agents affirmatively deceived the defendant by answering questions they knew were calculated to ascertain whether a criminal investigation was proceeding in a manner that incorrectly led the defendant to believe there was no such investigation.  On those facts, suppression was appropriate.  This case presents no analogous circumstances, but instead mere silence by the Coast Guard.

[12]  *See also Colorado v. Spring*, 479 U.S. 564, 576, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) ("This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is trickery sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline so to hold today."); *United States v. Greve*, 490 F.3d 566, 571-572 (7th Cir. 2007) (rejecting defendant's argument that IRS agent "affirmatively misled him by continuing to conduct a civil audit after she had firm indications of fraud," without telling him of her intentions to refer the matter for criminal investigation, because "she was not required to do so"); *United States v. McFarland*, 424 F. Supp.2d 427, 437 (N.D.N.Y. 2006) ("The failure to disclose the details of an investigation, or the fact that the suspect is a target of an investigation does not constitute affirmative deceit," as compared to "deliberate lies in response to a suspect's questions concerning the investigation or whether he is a target").

More broadly, many courts have recognized that a voluntariness analysis in circumstances of deception turns on whether the defendant was deceived about the nature of his rights or the consequences of abandoning them. *See, e.g., Farley*, 607 F.3d at 1329-30 (defendant's statement not involuntary even if agents tricked him into thinking investigation was about terrorism, rather than sex offenses for which he was truly being investigated, where defendant was not deceived about the nature of his rights and the consequences of abandoning them); *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004) (as to voluntariness of confession, "trickery or deceit is only prohibited to the extent that it deprives the defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them"). The kinds of deception that are generally deemed to trigger suppression are lies about a defendant's legal rights (*i.e.*, "you must answer our questions"), false promises (*i.e.*, "whatever you say will be just between us"), or threats (*i.e.*, "if you don't talk, you won't see your family for a very long time"). *See, e.g., United States v. Degaule*, 797 F. Supp.2d 1332, 1380 (N.D. Ga. 2011) ("[T]rickery can sink to the level of coercion, but this is a relatively rare phenomenon. … Generally, courts have held statements involuntary because of police trickery only when other aggravating circumstances were also present," such as coercive threats or deception as to the nature of his rights or the consequences of waiving them) (citations omitted).[13] La Forgia has made no argument and presented no evidence that the Coast Guard lied to him about his legal rights or the consequences of abandoning him, much less that any false promises or threats were made to induce him to speak.[14]

---

[13] *See also United States v. Boskic*, 545 F.3d 69, 78-80 (1st Cir. 2008) (explaining that police trickery is not automatically coercion, and rejecting defendant's argument that officers intentionally deceived him into believing he was not a target, where there was no evidence of "extrinsic factors" that distorted his judgment; "[a]lthough the fact that the agents allowed him to believe that he was not under investigation may have made him less guarded and self-protective, that deception alone did not make his statements involuntary").

[14] In his briefs, defendant argues that La Forgia would not have answered any questions had he known that the Coast Guard was conducting a criminal investigation, and suggests that he was misled about the nature of his rights by the Coast Guard agents' statements that they were conducting a Port State Control inspection and expanded MARPOL examination. (Doc. 83, at 3-4, 10; doc. 112, at 7.) Nothing in La Forgia's Declaration would support these propositions. La Forgia himself never says that the Coast Guard's representations about the scope of their investigation deceived him about the nature of his rights. Thus, counsel's argument extrapolates well beyond defendant's actual evidence submitted in support of the
(Continued)

Defendant's remaining arguments on the "misrepresentation" issue may be dispatched quickly. For example, La Forgia would ascribe significance to what he calls the Coast Guard's "conscious decision to intentionally mislead the vessel's crew … in order to deceive Mr. La Forgia and coerce him into making potentially incriminating statements." (Doc. 112, at 4.) This issue of intent is a red herring. The Eleventh Circuit has explained that agents' subjective intent is irrelevant to this analysis. *See Farley*, 607 F.3d at 1330 ("It does not matter if the agents deliberately lied to [defendant] about the subject of the investigation in order to trick him into [giving an interview]. Their subjective motives for the deception are not relevant. … [T]he issue is whether [defendant]'s decision to waive his rights was knowing and voluntary under the totality of the circumstances."). Similarly, La Forgia muddies the waters by arguing that "the government conceded that the Coast Guard affirmatively misled Mr. La Forgia as to the nature of its investigation as a subterfuge to obtain statements from Mr. La Forgia." (Doc. 112, at 5.) The Government has conceded no such thing. (*See* doc. 105, at 9 ("The Coast Guard did not mislead this defendant.").) Even if it had, under *Farley* the presence or absence of nefarious motive is of no consequence to the analysis.

In sum, the Coast Guard often wears multiple hats (administrative, civil, criminal) during a vessel inspection. The law does not impose on the Coast Guard an affirmative obligation to delineate which of those "hats" it is or may be wearing before it questions a suspect. Nor does the law provide that a statement is inadmissible if the Coast Guard neglects to volunteer that information to the suspect. Had La Forgia specifically asked whether the investigation was criminal, and had the Coast Guard lied to him in response, the analysis might be very different, just as it was in the *Schroder* case he cites. But that is not our case.

### B. Defendant's Other Objections Do Not Warrant Suppression.

As a sidelight to the misrepresentation issue propelling his Motion to Suppress, La Forgia repeatedly recites other facts that he contends warrant suppression of the statements he gave to the Coast Guard on January 25, 2012. He says that he was not given *Miranda* warnings and that

---

Motion. In any event, it is not clear why La Forgia's rights would be different in a Port State Control inspection (whose purpose is to verify compliance with U.S. and international law) than in a narrowly targeted criminal investigation, or why La Forgia would have any reasonable ground to believe that those rights were different.

he was not offered an Italian-English translator. (Doc. 83, at 2, 9-10.) His counsel complains that "the Coast Guard kept the Chief Engineer on his feet" until he was "physically exhausted," and only then "decided to formally interview the Chief Engineer," at which time "he was up for nearly twenty four hours." (Doc. 112, at 8-9.) These ancillary concerns – which are only minimally developed in defendant's filings – need not long detain the Court.

With respect to *Miranda* warnings, the record indeed establishes that they were not given. But that does not conclude the inquiry. "A suspect is only entitled to *Miranda* warnings when he is interrogated while in custody, because such circumstances are presumed to exert pressure on him to speak. … In determining whether a person was in custody, we look to whether he was physically deprived of his freedom in any significant way or if a reasonable person in the defendant's position would have understood that his freedom was so restrained." *United States v Lall*, 607 F.3d 1277, 1284 (11th Cir. 2010). The custody inquiry is critical. *See Cook v. Warden, Ga. Diagnostic Prison*, --- F.3d ----, 2012 WL 1371276, *5 (11th Cir. Apr. 20, 2012) (*Miranda* applies only to statements "stemming from custodial interrogation of the defendant," meaning "questioning initiated by law enforcement officers after a person has been taken into custody") (citations omitted). Why would a reasonable person in La Forgia's position have understood that he was physically deprived of his freedom in a significant way? Defendant does not say. Instead, he simply relies on La Forgia's statement in his Declaration that "I believed I was not free to leave the vessel." (Doc. 83-1, at ¶ 6.) Of course, his subjective beliefs are irrelevant. *See Lall*, 607 F.3d at 1284 ("The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant.") (citation omitted). The evidence before the Court is that the Coast Guard spoke with La Forgia in his own stateroom (*i.e.*, the quarters where he lived), in the engine room (*i.e.*, the place where he worked), and at various other locations aboard the Vessel at various times during the protracted inspection. There is no indication the record that his freedom of movement throughout the ship was restrained or curtailed in any meaningful way. He was not handcuffed, physically detained, or held in a particular room during the investigation, nor was he threatened with or subjected to any force by the Coast Guard agents. By all appearances, La Forgia enjoyed free rein to move about the Vessel as he wished during the inspection.

On this record, and in the absence of any serious attempt by defendant to argue otherwise, the Court has little difficulty concluding that La Forgia was not in custody when he

spoke with Coast Guard agents. *Miranda* warnings were therefore unnecessary. *See, e.g., United States v. Rioseco*, 845 F.2d 299, 303 (11th Cir. 1988) (vessel's master held not to be in custody during Coast Guard boarding and questioning, where he was not told that he was in custody or under arrest, even though Coast Guard officers were armed and ship personnel were gathered in one specific area of vessel during the search); *United States v. Li*, 206 F.3d 78, 83 (1st Cir. 2000) (crew member not in custody for *Miranda* purposes where Coast Guard had boarded and begun inspection, had gathered crew members in one section of the ship, but had neither applied nor threatened any force); *United States v. Baker*, 641 F.2d 1311, 1319 (9th Cir. 1981) (noting that "[g]enerally, routine Coast Guard boarding of vessels does not create a custodial situation requiring *Miranda* warnings" and finding no "custodial atmosphere" where weapons were not displayed upon boarding and fisherman was allowed to go on his way); *United States v. Fleet Management Ltd.*, 2008 WL 1989958, *11 (E.D. Penn. May 7, 2008) ("the Coast Guard's confinement of crew to a ship during an investigation does not constitute custody for *Miranda* purposes, even when criminal conduct is suspected").

With regard to the interpreter, defendant tells this Court time and time again that the Coast Guard did not offer him the assistance of an interpreter. But La Forgia proffers no evidence whatsoever to suggest that the absence of an interpreter in any way impinged on his understanding of what was happening or obviated the voluntariness of his statements to the Coast Guard, much less that he ever requested an interpreter or told Coast Guard officials he could not understand English well enough to comprehend their questions. In the absence of any indication or explanation as to how (if at all) the lack of an interpreter affected his decision to speak with the Coast Guard or impaired his free will in some way, La Forgia's mere repetition of the fact that no interpreter was offered is devoid of analytical significance for purposes of the Motion to Suppress. *See generally United States v. Munoz*, 748 F. Supp. 167, 170 (S.D.N.Y. 1990) ("There is no obligation to use a suspect's native language, as long as he has sufficient command of the language in which he was warned to waive his rights intelligently or knowingly.").

Finally, defendant's reply brief weaves a narrative that La Forgia was driven to physical exhaustion, deprived of rest, and forced to remain awake for nearly 24 hours before his statement was taken. (Doc. 112, at 8-9.) But La Forgia submits no evidence that he was not allowed to sit down or that he was forced to engage in physically exhaustive activities for a prolonged period of time during the inspection. Indeed, his Declaration is silent on the subject, and the Coast

Guard officers' statements submitted by defendant leave gaps of hours at a time where no mention is made whatsoever of any interaction with or requirements being placed upon La Forgia.  More fundamentally, there is no evidence that La Forgia gave a statement to Coast Guard officials in the middle of the night, when he was exhausted.  La Forgia does not say that he did.  The Coast Guard officials' statements (which defendant, not the Government, presents as exhibits to the Motion) unequivocally state that he <u>declined</u> to give a statement at that time, and reference only statements that he made early in the day, shortly after the inspection commenced.  (This is another area where defendant's vagueness about the statements which he seeks to suppress hurts his cause.)  In short, the "physical exhaustion" issue is supported by nothing other than the say-so of defense counsel, and is refuted by defense evidence.

### III.  Conclusion.

At the end of the day, "[w]e consider the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when deciding whether a confession was voluntary."  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010).   After careful consideration of all of the evidence and argument proffered by defendant in support of his Motion to Suppress, the Court finds no basis for concluding that any statements he gave to Coast Guard officials during their inspection of the M/V BOTTIGLIERI CHALLENGER on January 25, 2012 were not given voluntarily.  Accordingly, the Motion to Dismiss or in the Alternative to Suppress (doc. 83) is **denied**.

DONE and ORDERED this 21st day of May, 2012.

s/ WILLIAM H. STEELE  
CHIEF UNITED STATES DISTRICT JUDGE